IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

**SUE ANN WILLIAMS,** )
)
    Plaintiff, )
)
v. ) **Civil No. 11-440-GPM-CJP**
)
**MICHAEL J. ASTRUE,** )
**Commissioner of Social Security,** )
)
    Defendant. )

## REPORT and RECOMMENDATION

**PROUD, Magistrate Judge:**

This Report and Recommendation is respectfully submitted to District Judge G. Patrick Murphy pursuant to **28 U.S.C. § 636(b)(1)(B)**.

In accordance with **42 U.S.C. § 405(g)**, plaintiff Sue Ann Williams seeks judicial review of the final agency decision terminating her Disability Insurance Benefits (DIB) benefits pursuant to **42 U.S.C. § 423**.

### Procedural History

Plaintiff filed an application for DIB in August, 2001. (Tr. 410). In February, 2003, an ALJ issued a favorable decision finding that she had been disabled since October 2, 1999. (Tr. 401-413).

In July, 2008, the Commissioner notified Ms. Williams that he had determined that she had been engaged in substantial gainful activity beginning in April, 2006, and that she was no longer entitled to benefits. (Tr. 482). After the Commissioner reached the same conclusion on reconsideration, an evidentiary hearing was held before Administrative Law Judge (ALJ) Edward I. Pitts. (Tr. 622-666). In a written decision dated December 4, 2009, ALJ Pitts found that Ms. Williams had engaged in substantial gainful activity, and that she was no longer entitled to

benefits as of September 1, 2007. (Tr. 19-26). The Appeals Council denied review, and the December 4, 2009, decision became the final agency decision. (Tr. 6).

Plaintiff has exhausted her administrative remedies and has filed a timely complaint.

## Issues Raised by Plaintiff

Plaintiff raises two issues:

(1)  The ALJ erred in finding that payments to plaintiff from The Limu Company were the result of her substantial gainful activity.

(2)  The ALJ erred in failing to make a specific finding as to her credibility.

## Applicable Legal Standards

In order to receive DIB, a claimant must be disabled within the meaning of the applicable statutes. For these purposes, a person is disabled when he or she has the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A). "Substantial gainful activity" (SGA) is defined as work activity that involves doing significant physical or mental activities, and that is done for pay or profit. Work may be substantial even if it is done on a part-time basis. 20 C.F.R. §§ 404.1572.

Once a claimant has been awarded benefits, the agency undertakes a periodic review of continued eligibility to receive benefits. 20 C.F.R. §404.1594(a). Social Security regulations set forth a sequential eight-step inquiry to determine whether a claimant is under a continuing disability. 20 C.F.R. §404.1594(f). For purposes of this case, only step one is at issue. §404.1594(f) frames step one as follows:

> Are you engaging in substantial gainful activity? If you are (and any applicable trial work period has been completed), we will find disability to have ended (see paragraph (d)(5) of this section).

Paragraph (d)(5), referred to in the above section, provides that, if the claimant is

engaging in substantial gainful activity, the agency will determine whether she is entitled to a trial work period as defined in §404.1592. The trial work period allows the claimant to test her ability to work, while still receiving disability benefits. The nine months do not have to be consecutive, but they must occur within a period of 60 consecutive months. §404.1592(e).

If a claimant is deemed to be no longer eligible for benefits because she is engaged in substantial gainful activity, the agency is not required to consider whether medical improvement has occurred. 20 C.F.R. §1594(d). Therefore, it is not necessary to consider plaintiff's medical condition in this case.

The ALJ found that Ms. Williams was engaged in substantial gainful activity as a self-employed person. Plaintiff has not challenged the correctness of the finding that she was self-employed. The standards for determining whether work activity rises to the level of substantial gainful activity for self-employed persons are set forth in 20 C.F.R. §404.1575.

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. The scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether Ms. Williams was, in fact, engaging in substantial gainful activity at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. **See, Books v. Chater, 91 F.3d 972, 977-78 (7th Cir. 1996)** (citing ***Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)**). This Court uses the Supreme Court's definition of substantial evidence, i.e, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." **Richardson v. Perales, 402 U.S. 389, 401 (1971).**

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of

credibility, or substitute its own judgment for that of the ALJ. ***Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997)**. However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, ***Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

### The Decision of the ALJ

ALJ Pitts embarked upon the eight-step analytical framework described above. He first noted that the agency had previously determined that Ms. Williams was entitled to a nine month trial work period, and that the ninth month was August, 2004. He noted that Ms. Williams had not appealed from that determination. (Tr. 21-22).

The ALJ found that Ms. Williams' income tax return for the year 2006 indicated that she had net self-employment income of $18,316.00, from a distributorship for The Limu Company. In 2007, she claimed net self-employment income of $21,850.00 from her Limu distributorship. (Tr. 22-23).

The ALJ found that the income from Limu was income from self-employment. He therefore applied 20 C.F.R. §404.1575 to determine whether her activity as a distributor for Limu was substantial gainful activity. (Tr. 23). The ALJ determined that her activity qualified as SGA under the first of the three tests set forth in §404.1575(a)(2). (Tr. 24-25). He also found that her income for the years 2006 and 2007 was well over the amounts presumed to be SGA as provided by §404.1574. (Tr. 25). (The presumptive amounts set forth in §404.1574 are applicable to self-employed persons; see §404.1575(c) and (e).) Based upon these findings, he determined that she was engaged in substantial gainful activity at step one of the eight step inquiry, and so found that she was no longer entitled to receive disability benefits. (Tr. 25-26).

### The Evidentiary Record

The following summary is limited to the portions of the written record which are relevant

-4-

to the issues presented.

**1.     Prior Favorable Decision**

On February 26, 2003, an ALJ approved Ms. Williams' application for DIB, finding that she had been disabled since October 2, 1999.  (Tr. 401-413).

The agency issued a Notice of Award on March 17, 2003.  This letter informed Ms. Williams that she was entitled to begin receiving disability payments as of August, 2000, and that she would be receiving a check for the past-due payments.  Going forward, she would receive $935.00 per month.  (Tr. 415-420).

**2.     Income Tax Returns**

For the year 2006, plaintiff reported gross receipts from self-employment in the amount of $29, 777.00.  She used an IRS Form 1040 Schedule C which indicated she was a sole proprietorship.  She claimed net earnings from self-employment of $18, 316.00.  (Tr. 556-558).  The Limu Company issued a Form 1099 for the year 2006 showing nonemployee income in the amount of $27, 428.59.  (Tr. 567).

For the year 2007, plaintiff reported gross income from self-employment in the amount of $27, 258.00.  Her net self-employment income was $21, 850.00.  (Tr. 573-575).

**3.     Work Activity Report**

Plaintiff filed a Work Activity Report with the agency in June, 2008.  (Tr. 578-584).  She stated that the income reflected in her 2006 and 2007 tax documents was not "earned income."  She described it as "bonuses paid from a network marketing Company."  (Tr. 579).  She indicated that she was the "sole owner" of her business, and that it involved secretarial and network marketing.  (Tr. 578).  Ms. Williams furnished the agency with a copy of her "online office" with Limu.  (Tr. 585-598).  These documents list her as a distributor for Limu and detail payments made to her in 2006 and 2007.  Also included is a list of her "downline" distributors as of August, 2008.  (Tr. 597).

### 4. The Limu Company

Materials from the website of The Limu Company are at Tr. 600-612. According to these materials, the company sells products containing a nutrient called fucoidan, derived from a sea plant called Limu.

### 5. Evidentiary Hearing

Plaintiff was represented by an attorney at the hearing on November 4, 2009. (Tr. 624). Her attorney noted that her earnings were in excess of the presumptive SGA amount, but argued that the earnings did not result from the performance by her of significant services. (Tr. 626-627).

Ms. Williams testified that she first became involved with Limu in 2005 when she bought some of its products for her sick husband. (Tr. 633). In September, 2005, she decided to try to make some money by recruiting other people to be distributors. Her cousin's husband was her "sponsor" and worked with her to sign up distributors. (Tr. 635-636). She sent e-mails to people who had opted to receive communications about products and opportunities. (Tr. 637). She recruited a distributor named Mary Cook who, in turn, recruited others and "ballooned [plaintiff's] downline to about 1,600 people." (Tr. 638). Plaintiff recruited 15 to 18 other people in addition to Ms. Cook. (Tr. 638). She recruited her last person in 2008. (Tr. 639).

Plaintiff testified that she "never learned the compensation plan." (Tr. 640). She acknowledged that she "made some serious money," but said that she could not explain the program except to say that she would get a percentage of what her recruits and their downline distributors sold. (Tr. 641-642). In 2009, the company changed its compensation procedures; the materials in the record from The Limu Company's website describe the new procedures, not the procedures that were in effect in 2006 and 2007. (Tr. 643).

Ms. Williams stated that, under the program that was in effect in 2006 and 2007, she got

paid on distributors in her downline to seven levels. The further down the line the distributor was, the smaller her percentage would be. (Tr. 644).

In order to continue receiving weekly bonuses from Limu, plaintiff was required to buy a certain amount of product every month, which was referred to as being on auto-ship. In addition, she had to have 5 recruits who were also on auto-ship. If she did not have 5 people on auto-ship, but she continued to be on auto-ship, she would still receive monthly bonuses. (Tr. 645-647). She could do whatever she wanted with the product that she bought. She could drink it or give it away. (Tr. 648). She said that it varied, but she never spent more than 15 to 20 hours a month working on this. (Tr. 651). She would send out e-mails and follow up with the people who responded. Sometimes she had the people come to her house. (Tr. 652). She resigned in May or June of 2009 because she made hardly any money under the new compensation plan. (Tr. 653-654).

During 2006 and 2007, she continued to try to recruit new distributors. (Tr. 656). Her attorney noted that a paper in the file indicates that she signed up 4 people in 2005, 4 people in 2006, 6 people in 2007, and 1 person in 2008. (Tr. 661).

## **Analysis**

Plaintiff first argues that the ALJ erred in finding that her income from The Limu Company in 2006 and 2007 resulted from substantial gainful activity. Her argument is not well-developed in that she offers no analysis of the record in light of the applicable regulations.

Plaintiff's argument rests on her contention that the ALJ misconstrued her testimony in several respects. She takes issue with the ALJ's statement that she received payments from Limu based on her own activities and on the activities of other distributors. See, Doc. 25, p. 14. However, that is exactly what Ms. Williams testified to: she said that she had to buy a certain amount of Limu product each month in order to receive a weekly or monthly bonus. If she had 5

recruits in her frontline who also bought product each month, she received a weekly bonus. She received additional payments based on the activities of her recruits and those persons who were, in turn, recruited by her recruits. (Tr. 644-647).

Another alleged error identified by plaintiff is that the ALJ said that she received payments based on her own purchase of Limu products. See, Doc. 25, p. 15. Plaintiff misconstrues her own testimony in an attempt to show that the ALJ was wrong. Ms. Williams did testify that she did not receive any payment from Limu in the beginning, when she was just purchasing product but had not yet recruited any distributors. (Tr. 634-636). However, it is abundantly clear from her later testimony that she had to continue purchasing Limu products every month in order to receive bonuses. (Tr. 644-646).

Plaintiff also takes issue with the ALJ's statement that she had to continue recruit new distributors in order to continue to receive payments. See, Doc. 25, p. 15. This is a red herring. Whether or not she was required to do so, Ms. Williams did, in fact, continue to recruit new distributors in 2006 and 2007. According to her own testimony, and a document discussed by her attorney at the hearing, Ms. Williams successfully recruited 4 people in 2006 and 6 people in 2007. (Tr. 656, 661).

When the record is analyzed with reference to the applicable regulations, it is clear that the ALJ's decision is supported by substantial evidence. First, he determined that she was self-employed, and therefore analyzed her case under 20 C.F.R. §404.1575, rather than §404.1574. The latter section applies to a person who is an employee, rather than self-employed. In the analysis under §404.1574, the ALJ must consider whether the claimant's income exceeds the reasonable value of the actual services performed. In effect, that is what plaintiff is arguing when she argues that she was paid based not on her own activities but on the activities of her recruits and downline distributors. However, plaintiff has not challenged the ALJ's finding that she was

self-employed, and she could not reasonably do so on the record presented. Whether or not her income exceeded the reasonable value of her actual services is simply not a consideration under self-employment regulation, §404.1575.

§404.1575 sets forth three tests for determining whether a self-employed claimant has engaged in SGA. The ALJ found that Ms. Williams was engaged in SGA under the first test. The first test is "You have engaged in substantial gainful activity if you render services that are significant to the operation of the business and receive a substantial income from the business." §404.1575(a)(2)(1).

There is no question that Ms. Williams received "substantial income" from her business. Per §404.1575((c), substantial income is income in excess of the presumptive SGA amounts set forth in §404.1574(b)(2). As the ALJ noted, the presumptive SGA level for 2006 was $10, 320.00. Plaintiff's net self-employment income for 2006 was $18, 316.00. The presumptive level for 2007 was $10,800.00, and plaintiff's net self-employment income for that year was $21, 850.00. (Tr. 25). Thus, the only question is whether Ms. William rendered services that were significant.

Whether Ms. Williams rendered services that were significant to her business must be answered in light of the regulatory definition. 20 C.F.R. §404.1575(b) provides that, if "you operate a business entirely by yourself, any services that you render are significant to the business." The ALJ applied this section and concluded that Ms. Williams "was a sole proprietor in this multiple level marketing business so it means all of her activities were significant even if she had a high profit for her hours worked." (Tr. 25). This is a reasonable application of the regulations and this conclusion is supported by substantial evidence in the record.

Plaintiff's second point is that the ALJ should have made specific findings as to her credibility. The Commissioner argues that no such findings are required at step one of the

analysis. It is unnecessary to decide whether or not credibility findings are ever required at step one because, in this case, the ALJ accepted the accuracy of Mrs. Williams testimony in all relevant respects. As was explained above, the crucial inquiry in this case is what Ms. Williams actually did in 2006 and 2007. She testified that she continued to recruit new distributors, and she was successful in signing up new people in those years. Thus, for purposes of analyzing whether she was engaged in SGA, whether or not she was required to sign up new distributors is beside the point. Because the ALJ did not discount plaintiff's testimony as unbelievable, a full-blown analysis of her credibility was not required.

## Recommendation

This Court recommends that Commissioner's final decision be **AFFIRMED**.

Objections to this Report and Recommendation must be filed on or before **April 16 , 2012.**

**Submitted: March 28, 2012.**

s/ Clifford J. Proud
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**
